```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
                    NORTHERN DIVISION
                      AT COVINGTON
```

CONSOLIDATED
CIVIL ACTION NO. 2007-130 (WOB)

ROBIN SEXTON
and ROBIN ROBINSON                                    PLAINTIFFS

VS.                  MEMORANDUM OPINION AND ORDER

KENTON COUNTY DETENTION CENTER,
ET AL                                                 DEFENDANTS


On March 10, 2010, oral argument on pending motions was held in this matter. Robert E. Blau and Robert L. Poole represented the plaintiff, Robin Robinson; David F. Fessler represented the plaintiff, Robin Sexton; Jason Reed represented the defendants, Kenton County Detention Center, Kenton County Fiscal Court, and Jailer Terry Carl and Chief Deputy Rodney Ballard, in their official capacities; and Mary Ann Stewart represented the defendants, Jailer Terry Carl and Chief Deputy Rodney Ballard, in their individual capacities. Official court reporter Joan Averdick recorded the proceedings.

### Factual Background

This is an action under 42 U.S.C. § 1983, whereby plaintiffs allege violation of their civil rights as a result of two rapes

1

committed by Deputy Jailer Michael Stokes.  The occurrence of the these rapes upon the plaintiffs is not in dispute by the defendants involved in these motions.  However, defendant Michael Stokes maintains that the sexual intercourse with plaintiffs was consensual.  (Doc. 88).  Defendant Stokes subsequently pled guilty to a misdemeanor offense and served one year in jail.  Default judgment proceedings against defendant Stokes are pending.

### A. The assault on Robin Robinson.

On November 1, 2006, Robin Robinson was arrested for non-support and taken to the Kenton County Detention Center (Detention Center).  After being detained in a holding cell for a period of time, Ms. Robinson was moved to an isolation cell because of her psychiatric history.

On November 2, 2006, while in the isolation cell, Robinson noticed that Deputy Jailer Stokes was looking in the window of her cell more often, and lingered longer, than the other guards.  Eventually, Stokes began talking to her, asking what she looked like under the jail-issued gown she was wearing.  Robinson testified that she did not think he was serious and she looked away.  Stokes returned and asked her if she was going to show him what she looked like under the gown and she responded "no."  Stokes gave Robinson a cigarette and a lighter, both of which are prohibited, and left her cell while she smoked the cigarette.

2

Stokes returned to retrieve the lighter, leaving the jail door unlocked when he left.

About an hour later, Stokes entered Robinson's cell, told her he wanted to see what was under the gown, and she said "no." He unbuttoned his pants, exposing himself, and forced her to perform oral sex. He then turned her around and had sex with her from behind.

Soon after the assault, Robinson was moved to general population. She was escorted to her new cell by a female deputy jailer, but she did not tell the deputy jailer, or any other employee, about Stokes assaulting her.

On November 8, 2006, Robinson was taken to the arraignment room by a deputy jailer. Robinson was not expecting to be in court because she had not been charged with any new crimes. When she inquired as to why she was being taken to the arraignment room, a deputy jailer told her that her name was on the list. When she arrived in the arraignment room, she saw that Stokes was overseeing the video arraignments. Stokes directed all the inmates to where they should sit, but did not speak directly to Robinson. As the inmates were arraigned, they left the room. Eventually, Robinson was left alone with Stokes.

Stokes left the arraignment room and quickly returned. He turned off the video monitor and walked over to where Robinson was sitting. He unbuttoned his pants, forced Robinson to perform

3

oral sex, turned her around and again forced her to have sex. Afterwards, Stokes gave her a cigarette to take with her and he walked her to the elevator to return to her cell.

Other than her cellmate, Robinson did not tell anyone about the assault until November 28, 2006, when she then reported it to Deputy Jailer Barb Edwards. Edwards told Robinson to write a statement and Edwards reported the matter up the chain of command.

**B. The assault on Robin Sexton.**

On November 14, 2006, Robin Sexton was arrested for prostitution and taken to the Detention Center. Sexton was placed in a holding cell while waiting to be arraigned. A deputy jailer escorted Sexton from the holding cell to the arraignment room. Stokes was overseeing the arraignment room. After the arraignments were over and the inmates were leaving, Stokes told Sexton to wait in the arraignment room. Sexton did not think anything was amiss with his instruction because she thought she might have another court appearance.

When Stokes returned, he handed Sexton a cigarette. While she smoked the cigarette, Stokes told her he had seen her on the street the night before and stated that he knew Sexton's boyfriend. He eventually asked her to show him her breasts while he was pulling at the zipper on her jacket. She pulled away, he unbuttoned his pants, exposed himself and forced her to perform

oral sex. He then pulled her to a standing position, motioned for her to turn around, tugged at her pants, and forced her to have sex.

Afterwards, Stokes told Sexton that if anyone asked why she did not return with the other inmates, she should say that she was the last one on the docket. Stokes then told Sexton he would try to call pretrial services on her behalf. He then escorted Sexton to the elevator, and Deputy Jailer Sue Toll escorted her back to the holding cell. Sexton did not tell Toll that Stokes had assaulted her.

After Sexton was processed and taken to her cell in general population, she called her mother and told her that she had been molested by a guard. Sexton also told a cellmate about the assault, and the cellmate encouraged her to call Hal Spaw, an investigator for the Public Defender's Office. Sexton called Mr. Spaw, and he came to the jail to talk to her. Sexton told Spaw that Stokes had molested her. On the way out of the interview with Spaw, Sexton saw Deputy Jailer Barb Edwards and told her about the assault.

Edwards told Sexton to write down what happened and she would come get the statement and make sure it got to the right person. Sexton returned to her cell and had her cellmate help her write a statement. Edwards retrieved Sexton's written statement and passed it up the chain of command.

5

**C. The Kenton County defendants' response to the assaults.**

On November 17, 2006, Spaw left his meeting with Sexton and went to defendant Ballard's office. Spaw told Ballard that Sexton had just told him that Stokes had sexually assaulted her. Ballard immediately called Colonel Colvin. Colonel Colvin and Captain Moore came to Ballard's office, and Spaw told them what Sexton had told him.

Within twenty minutes of discussing the incident, Ballard had Sexton's clothing bag, containing her street clothes and undergarments, collected as evidence. (Ballard depo. p. 26). Ballard also called the Kenton County Police Department and requested they begin a criminal investigation, while he initiated an internal investigation. Colvin and Moore left the meeting, found Jailer Carl and briefed him on the allegations and the plan of action.

Detective Scroggins of the Kentucky State Police Department came to the Detention Center and interviewed Sexton. Ballard also conducted an interview with Sexton regarding the incident. Stokes was placed on administrative leave without pay. (Carl depo. p. 24).

On November 28, 2006, while the police and the Detention Center were investigating Sexton's allegations, Captain Moore received Robinson's written statement regarding her claim that Stokes had sexually assaulted her on two occasions. (Doc. 70-

14). On November 29, 2006, Moore called Officer Scroggins, the Kentucky police officer investigating the Sexton incident, and told him of Robinson's allegations. Scroggins came to the jail and interviewed Robinson, while Moore began his internal investigation.

On January 18, 2007, as a result of its investigation, the Commonwealth of Kentucky charged Stokes with three counts of rape and three counts of sodomy. (Doc. 74-22). Stokes was fired on the same day.

**D. The hiring and training of Michael Stokes.**

Ballard, the chief deputy in charge of daily operations of the Detention Center, testified that he was familiar with Stokes prior to hiring him because he was a referee for Ballard's son's AAU basketball league. Stokes testified that Ballard suggested he apply for a deputy jailer position, but Ballard denies that he approached Stokes about the job. Ballard contends that he recognized Stokes' name on an application and, based upon his observations of Stokes as a referee, he thought he would make a good deputy jailer.

After interviewing Stokes, Ballard conducted a background check and learned that he had several misdemeanor convictions for nonpayment of child support, traffic violations, and a fourth degree assault charge, involving a domestic dispute with his girlfriend. Ballard testified that he took these convictions

7

seriously. After considering the age of the misdemeanor convictions, the lack of any felony convictions, the numerous letters of recommendation, including one from the victim of his assault and one from Chief Goodenough of the Villa Hills Police Department, and Stokes' agreement to condition employment on having payroll deductions sent directly to pay his child support arrearage, Ballard recommended that Jailer Carl hire Stokes as a deputy jailer.

On August 1, 2005, Stokes was hired as a Kenton County Deputy Jailer. On December 30, 2005, Stokes completed 160 hours of field training and in February 2006 completed 100 hours of basic detention training. (Doc. 70-7 & 8). Stokes testified that he was trained that fraternization of any kind between deputy jailers and inmates was against jail policy. (Stokes depo. pp. 72-73).

Until the incidents were reported by Sexton and Robinson, Stokes had not been the subject of any inmate complaints. In fact, the only problems Stokes had with his employment, prior to these incidents, related solely to his tardiness and absenteeism. At the time of the incidents, Stokes was on probation for attendance issues.

**ANALYSIS**

Plaintiffs assert a § 1983 claim against the Kenton County

8

Detention Center, the Kenton County Fiscal Court, Kenton County Jailer Terry Carl and Chief Deputy Rodney Ballard, in both their official[1] and individual capacities. Plaintiffs allege that the defendants were deliberately indifferent in the hiring and supervision of Deputy Jailer Stokes, as well as deliberately indifferent in failing to monitor and protect the plaintiffs from harm while they were incarcerated at the Kenton County Detention Center.

In a § 1983 action against a municipality, a court must analyze two distinct issues: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). There is no doubt that the sexual assault of an inmate by a guard at the jail constitutes a violation of the inmate's constitutional rights.[2] Thus, the case turns on whether the county defendants

---

[1] The claims against the Fiscal Court, the Detention Center and Carl and Ballard in their official capacities are treated as claims against Kenton County. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005); *Ellis v. Campbell*, No. 3:08-cv-P458-S, 2009 WL 86605 (W.D. Ky. January 12, 2009). These defendants will be referred to collectively as the "county defendants."

[2] Plaintiffs allege violations of the Eighth and Fourteenth Amendments. The Eighth Amendment prohibits cruel and unusual punishment to post-conviction inmates. Pretrial detainees are guaranteed equivalent rights by the Due Process Clause of the Fourteenth Amendment. Thus, although Sexton was being held as a pre-trial detainee and Robinson was serving a term of incarceration, their claims are analyzed under the same standard.

are liable for that violation.

A municipality cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). The policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir. 1994) (quoting *Polk County v. Dodson,* 454 U.S. 312, 326 (1981)). See also *Bd. of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 404 (1997). Thus, the plaintiffs here must identify a Kenton County Detention Center policy or custom that was the moving force of the constitutional violation and that the violation arose as a result of deliberate indifference to the plaintiffs' rights. *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

To constitute a "moving force" behind plaintiffs' injuries, the policy or custom must be closely related to the ultimate injury. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). "[P]roof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom

---

*See Ford v. County of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008).

and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. 2008) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987)).

Here, plaintiffs do not articulate a precise policy or custom that was the moving force behind their injury. Instead, their expert identifies four bases of liability: 1) inappropriate hiring practices; 2) improper discipline; 3) ineffective supervision of Stokes; and 4) negligent use of surveillance equipment. None of these theories, however, establishes the requisite link between the policy or custom and the violation.

**a. Improper hiring practices**.

Plaintiffs argue that the county defendants are liable for their injuries because the county defendants hired Stokes without properly performing a background check, which plaintiffs argue demonstrates a propensity toward violence against women. The law is well settled that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Brown*, 520 U.S. at 411.

Furthermore, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id*. at 412 (emphasis in original).

Despite defendant Stokes' criminal record, which included several convictions for non-support, driving infractions, and one misdemeanor assault charge, involving a domestic situation, plaintiffs fail to demonstrate that the county defendants knew that Stokes was highly likely to inflict the particular injuries suffered by them.[3] None of Stokes' prior misdemeanor offenses demonstrated a propensity to commit rape. Thus, plaintiffs have not established that the county defendants were deliberately indifferent to their rights by improperly hiring Stokes.

**b. Improper discipline.**

Plaintiffs also argue that the county defendants' failure to fully discipline and ultimately terminate Stokes due to his repetitive tardiness and absenteeism, was deliberately indifferent to their constitutional rights. Again, the plaintiffs must identify a policy or custom that was the moving

---

[3]Plaintiffs argue that defendants failed to discover two prior incidents of domestic violence involving the mother of Stokes' children. However, the records plaintiffs cite to involve civil matters and are not a part of Stokes' criminal record.

force of the constitutional violation and that it arose as a result of deliberate indifference to those rights. *Doe v. Claiborne County*, 103 F.3d at 508.

Plaintiffs fail to demonstrate a county policy or custom of keeping employees with excessive absenteeism, nor can they show the causal link required between Stokes' absenteeism and the sexual assaults that he committed. There is no evidence to suggest the county defendants' decision to retain Stokes, despite his absenteeism, made it plainly obvious that he would subsequently sexually assault the plaintiffs. The test for a "moving force" is one of proximate cause, not "but-for" causation. *Mann v. Helmig,* 289 F. App'x 845, 850 (6th Cir. 2008). Even if plaintiffs' allegations are true, the county's "purported failure to discipline a single officer, as opposed to a systematic policy, cannot support a claim of municipal liability. A *Monell* claim will fail where the plaintiff provides evidence as to only a single officer, rather than evidence regarding department-wide inadequacy in training." *Meas v. City and County of San Francisco*, No. C 08-4075 PJH, 2010 WL 334455 (N.D. Cal. January 28, 2010). Thus, plaintiffs' claim of improper discipline as the basis for § 1983 liability must also fail.

    **c. Improper supervision.**

Plaintiffs also assert that the county defendants were

deliberately indifferent to their constitutional rights by failing to properly supervise Stokes. Again, plaintiffs fail to identify a policy that specifically discouraged proper supervision of inmates at the Detention Center. Instead, plaintiffs argue that the county defendants had a custom of not closely supervising its employees, which in turn led to Stokes' brazen criminal sexual assaults upon them. Plaintiffs contend that the defendants' custom of lax supervision encouraged Stokes' criminal behavior because he knew that his conduct would not be detected by his supervisors.

To prevail on such an "inaction" theory, the plaintiffs here need to establish: (1) the existence of a clear and persistent pattern of sexual abuse by the Detention Center employees; (2) notice or constructive notice on the part of the county defendants; (3) the county defendants' tacit approval of the unconstitutional conduct, such that its deliberate indifference in failing to act amounts to an official policy of inaction; and (4) that the county defendants' custom was the "moving force" or direct causal link in the constitutional deprivation. *Doe v. Claiborne County*, 103 F.3d at 508.

There simply is no evidence of any pattern of sexual abuse by defendant Stokes nor by any other Detention Center employees. Furthermore, the plaintiffs propound no evidence that the county defendants had a custom of inaction once allegations of sexual

14

assault were made by any inmates. On the contrary, on the few occasions where the county defendants discovered improper consensual fraternization between inmates and deputy jailers, the county defendants immediately confronted the deputy jailers involved and ended their employment.

Likewise, the plaintiffs fail to show that the county defendants had any knowledge, constructive or otherwise, of the sexual assaults on the plaintiffs until *after* Sexton reported the assault to Deputy Jailer Edwards. Once Sexton reported the incident, the county defendants immediately placed Stokes on administrative leave, and began both an internal and criminal investigation. Without any prior knowledge, actual or constructive, there is no evidence that there was a "high degree of predictability" that Stokes was likely to sexually assault the plaintiffs. Thus, plaintiffs have failed to establish that the county defendants had a custom of improper supervision that reflected a deliberate indifference and was the "moving force" behind the sexual assaults committed by Stokes. *Doe v Claiborne County*, 103 F.3d at 508 *and Searcy*, 38 F.3d at 286.

Plaintiffs also briefly argue that the county defendants' policy of permitting male deputy jailers to supervise female inmates without supervision or monitoring is evidence of the county defendants' deliberate indifference to a known risk of harm. Absent evidence of prior complaints of sexual assault, the

15

mere fact that a male guard supervises a female inmate does not lead to the conclusion that the inmate is at a great risk of being sexually assaulted by the guard. *See Balbridge v. Jeffreys*, No. 07-15130, 2009 WL 275669 (E.D. Mich. Feb. 5, 2009) (citing *Hovater v. Robinson*, 1 F.3d 1063, 1066-67 (10th Cir. 1993)) (citing other cases holding same).

    **d. Ineffective surveillance.**

Plaintiffs also claim that the county defendants were deliberately indifferent to their safety by not effectively monitoring the surveillance equipment. Specifically, plaintiffs argue that only one person monitored the 89 cameras that were used throughout the Detention Center and that they were mainly monitored only for ingress and egress of secured doors. Plaintiffs also argue that the county defendants should have had cameras in the video arraignment room for the inmates' protection.

For the same reasons that plaintiffs' theory of improper supervision fails under § 1983, so does their ineffective surveillance theory. Despite plaintiffs' statement to the contrary, the Kentucky Administrative Regulations do not require constant monitoring of video surveillance cameras or dictate where the cameras are to be placed inside a detention facility. Although one person is assigned to watch the monitors, there is no evidence this function cannot be effectively performed by one

16

person. Again, plaintiffs fail to establish a policy or custom of ineffective surveillance that reflected a deliberate indifference and was the "moving force" behind the sexual assaults committed by Stokes. *Doe v. Claiborne County*, 103 F.3d 508 *and Searcy*, 38 F.3d at 286.

For the foregoing reasons, plaintiffs' federal claim against the county defendants must fail because the plaintiffs have not identified a policy or custom that was the "moving force" behind the constitutional violation. Accordingly, the county defendants are entitled to summary judgment.

  **e. Individual Capacity Claims.**

Plaintiffs also assert claims against Carl and Ballard in their individual capacities. Plaintiffs' claims are based on the same theories as those alleged against defendants Carl and Ballard in their official capacities.

It is well established that liability under a § 1983 claim cannot be based on a theory of *respondeat superior*. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978). Instead, to impose supervisory liability, there must be a showing that defendants either "encouraged the specific incident of misconduct or in some other way directly participated in it." *Doe v. Magoffin County Fiscal Court*, 174 F. App'x 962, 970 (6th Cir. 2006) (quoting *McQueen v. Beecher County Sch.*, 433 F.3d 460, 470 (6th Cir. 2006)). "At a minimum, a § 1983 plaintiff must

17

show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984).

Plaintiffs fail to posit evidence that defendants Carl and Ballard either knew of Stokes' unlawful conduct, or "implicitly authorized, approved or knowingly acquiesced" to such conduct. *Id.* at 421.

Instead, plaintiffs argue that Carl and Ballard implicitly approved Stokes' conduct by: (1) hiring Stokes without performing a proper criminal background check; (2) delaying his official training for four months; (3) failing to investigate an inmate complaint against Stokes' for excessive force; and (4) by disregarding his absenteeism, tardiness and insubordination.

The Sixth Circuit has rejected similar claims against supervisors, noting that such a theory "improperly conflates a § 1983 claim of individual supervisor liability with one of municipal liability." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008).

Because neither Carl nor Ballard had any knowledge that Stokes posed a risk to either plaintiff, their § 1983 claim against them in their individual capacities fails as a matter of law. *See also Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (noting that prison officials who lacked knowledge of a risk

cannot be said to have inflicted punishment under the Eighth Amendment).

### f.  State Law Claims

Because the court is dismissing plaintiffs' federal causes of action, and because their state law claims present complex questions of immunity under Kentucky law, the court will decline to exercise its supplemental jurisdiction over the plaintiffs' state law claims.  *See* 28 U.S.C. § 1367(c).  Those claims will thus be dismissed without prejudice.

Therefore, having reviewed this matter,[4] and the court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) Defendants' joint motion to strike the report and testimony of plaintiffs' expert witness (Doc. 69) is hereby **DENIED**;

(2) Motion of Defendants, Kenton County Detention Center, Kenton County Fiscal Court, and Jailer Terry Carl and Chief Deputy Rodney Ballard, in their official capacities, for summary judgment (Doc. #71) is hereby **GRANTED,** and all federal claims be, and are hereby, **DISMISSED WITH PREJUDICE**;

(3) Motion of Defendants, Jailer Terry Carl and Chief Deputy

---

[4] The court's review of the matter also includes the plaintiffs' supplemental memorandum (Doc. 93) and the authorities cited therein, none of which were on point.

19

Rodney Ballard, in their individual capacities, for summary judgment (Doc. #70) is hereby **GRANTED,** and all federal claims be, and are hereby, **DISMISSED WITH PREJUDICE;**

(4) The court declines to exercise its supplemental jurisdiction over plaintiffs' state law claims, and those claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE.**

This 18th day of March, 2010.



Signed By:
William O. Bertelsman  WOB
United States District Judge

TIC: 36 minutes